UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 6:20-CR-24-REW-HAI |
| v. ) | |
| ) | RECOMMENDED DISPOSITION |
| KELLY J. GUDGER, JR., ) | |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

### I. Background and Procedural Posture

The Court, on referral, considers a reported supervised release violation by Defendant Kelly J. Gudger, Jr. District Judge Jarvis of the United States District Court for the Eastern District of Tennessee entered a judgment against Defendant on March 28, 2007, following a plea of guilty to violating 18 U.S.C. § 2113(a) & (d) (Bank Robbery by Force, Violence, and Intimidation) and 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Crime of Violence). Defendant was originally sentenced to 248 months of imprisonment and a five-year term of supervised release. *Id.* at 2–3. Defendant was released from custody to begin service of his five-year term of supervised release on May 14, 2020. On June 11, 2020, transfer of jurisdiction was accepted by the Eastern District of Kentucky. D.E. 1.

On November 13, 2020, the United States Probation Office ("USPO") issued the Supervised Release Violation Report ("the Report") that initiated these proceedings and secured an arrest warrant on November 13, 2020. Defendant was arrested on May 27, 2022. The Report charges Defendant with one violation stemming from an incident that occurred in November 2020.

Violation #1 alleges that Defendant committed state crimes based upon three pending charges in Bell District Court, specifically violations of Ky. Rev. Stat. § 508.020 (Assault, Second Degree), Ky. Rev. Stat. § 508.030 (Assault, Fourth Degree), and Ky. Rev. Stat. § 508.170 (Strangulation, First Degree).

Defendant was scheduled to make an initial appearance pursuant to Federal Rule of Criminal Procedure 32.1 on May 31, 2022. D.E. 6. The initial appearance was converted to a docket call "due to Defendant's disruptive behavior." *Id*. Defendant's subsequent motion for a competency evaluation was granted. D.E. 10. Defendant was determined to be incompetent to proceed and was committed to the custody of the Attorney General for competency restoration. D.E. 30 at 4. After lengthy proceedings, Defendant's competency was restored. D.E. 72.

The Court thereafter proceeded to conduct an initial appearance pursuant to Federal Rule of Criminal Procedure 32.1 on June 25, 2024. D.E. 73. No preliminary hearing was held due to Defendant's outstanding state charges. *Id.* The initial hearing was set to be followed by a final hearing, but, although the defense expressed an intent to stipulate, that stipulation was not acceptable to the undersigned because of Defendant's inability to focus, so the final hearing was continued. *Id*. Defendant was remanded to United States Marshal Service custody. *Id*.

## II. Evidence Presented

At the final hearing on July 15, 2024, the United States called three witnesses. The United States first called Defendant's 78-year-old mother, Matilda Swain. She identified Defendant as her son and testified that she was at her residence with Etta Sergent, a local nurse, when Defendant attacked her on the night of November 10, 2020. In her words, Defendant "grabbed and choked" her "almost to death." She stated she lost consciousness during the attack. She displayed the location of her son's hands, on her throat, and stated he squeezed. Sergent attempted to stop

2

Defendant from choking his mother. When Sergent did so, Defendant began "beating and kicking" Sergent. Defendant's mother testified that she did not remember the precise details of Defendant's attack on Sergent because she had passed out "and was sorta out of it." At that point, Defendant's mother ran over to the neighbor's house to get help and collapsed. The police responded to the scene. Defendant's mother explained that, afterward, Defendant told her that demons told him to attack her.[1] Defendant's mother testified that, after the attack subsided, she and Sergent went to Middlesboro ARH hospital, where she stayed three days. On cross, she acknowledged she had no broken bones or scarring from the incident, but did have significant swelling and bruising on her neck for two weeks. Upon questioning by the Court, she initially said she did not remember clearly that Defendant put his hands on her throat, but she later clarified that she "knew" he put his hands on her throat.

The United States also called Jacob Perry, who was employed with the Bell County Sherriff's Department in November 2020. Perry responded to a reported assault on November 10, 2020, and found the victims at the neighbor's residence. Perry explained that the victims were bloodied and had visible bruises. Perry conveyed that the victims had lacerations on their faces when he arrived. He stated the victims were visibly scared and panicked when he arrived. Perry photographed the victims, which photographs were introduced into evidence and have been reviewed by the undersigned.[2] Perry conveyed that Sergent had a swollen face, difficulty speaking, and was "unable really to open her mouth." Perry explained that Sergent was able to tell him that Defendant had attacked her and detailed the precise details of the attack by punching her in the face multiple times and kicking her. Sergent is now deceased, but her passing was not related to the assault. Perry described some of Defendant's mother's injuries as well, including a

---

[1] No defense of insanity was ever raised or relied upon.
[2] Perry also took photographs of Defendant's mother's house, which were introduced into evidence.

3

large laceration on her bottom lip, bruising on her face, and marks on her neck. He described some of the pictures as depicting blood in the mother's residence. Perry conveyed that, by the time he arrived on scene, Defendant had fled. Defendant was subsequently located and arrested. Perry confirmed that Sergent and Defendant's mother were taken to Middlesboro ARH for medical treatment.

Finally, the United States called Defendant's supervising United States Probation Officer, Matthew Armstrong. Armstrong was made aware by Defendant's mother's neighbor that Defendant had been arrested for assaulting Defendant's mother and Sergent on November 10, 2020. Armstrong testified that he confirmed that the information conveyed by the neighbor was accurate and identified the precise charges that Defendant was facing before reporting the violation. He also had reviewed portions of the certified medical records of Sergent and Defendant's mother that were introduced as exhibits 2 and 3.

### III. Violation Findings

To reiterate, Violation #1 alleges that Defendant committed a federal, state, or local crime, based upon three pending charges in Bell District Court, specifically violations of Ky. Rev. Stat. § 508.020 (Assault, Second Degree), Ky. Rev. Stat. § 508.030 (Assault, Fourth Degree), and Ky. Rev. Stat. § 508.170 (Strangulation, First Degree). Of course, the Court must find "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3); *see also United States v. Cofield*, 233 F.3d 405, 406 (6th Cir. 2000) ("In order to revoke supervised release, the sentencing court must find by a preponderance of the evidence that a defendant has violated a condition of his supervised release."). The evidence presented by the government was not rebutted by the defense.

The Court finds, by a preponderance of the evidence, that Defendant committed strangulation in the first degree under Ky. Rev. Stat. § 508.170. Specifically, Swain's testimony that Defendant choked her to the point where she lost consciousness permits the Court to find that Defendant "intentionally impede[d] the normal breathing … of another person by … applying pressure on the throat or neck of the other person." Ky. Rev. Stat. § 508.170. She testified with sincerity, sympathy towards her son, and hope for his future. Her sincerity and lack of vindictiveness serve to credit her account. Although elderly, she was direct and forthright in her testimony. Additionally, the EMS records introduced by the United States corroborate Swain's testimony, as does Perry's testimony. The record matches well with facts the Supreme Court of Kentucky has held to be sufficient to support a strangulation in the first degree conviction. *See Saxon v. Commonwealth*, 671 S.W.3d 1, 10-11 (Ky. 2023) (analyzing the statutory language and finding no error in refusing to grant a directed verdict based upon testimony that the victim could not breathe and felt she would pass out due to the defendant squeezing her neck). The sole argument made by the defense was not based upon any legal deficiency in the proof in terms of whether the statutory elements were satisfied. Instead, the defense argued that a single equivocal statement by Swain meant her testimony should be rejected. In the Court's view, that equivocation was a function of a poorly phrased question from the Court and she later testified with conviction that she "knew" Defendant choked her.

In addition, the evidence preponderates to allow the Court to conclude that Defendant committed assault in the second degree. "A person is guilty of assault in the second degree when … [h]e intentionally causes serious physical injury to another person." Ky. Rev. Stat. § 508.020(1)(a). Serious physical injury is defined as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of

5

health, prolonged loss or impairment of the function of any bodily organ, or eye damage or visual impairment." Ky. Rev. Stat. § 500.080(19). At the final hearing, the United States relied on the "substantial risk of death" prong to establish "serious physical injury." Kentucky's Supreme Court has found that, when a 74-year-old individual who is in poor health blacks out due to choking, they have been placed in a substantial risk of death. *Cooper v. Commonwealth*, 569 S.W.2d 668, 671 (Ky. 1978). Here, Defendant choked his elderly mother to the point where he caused her to black out, thereby causing her a "substantial risk of death." Thus, Defendant has committed assault in the second degree.

Finally, the evidence presented at the final hearing permits the Court to conclude that Defendant committed assault in the fourth degree. "A person is guilty of assault in the fourth degree when … he intentionally or wantonly causes physical injury to another person." Ky. Rev. Stat. § 508.030(1)(a). Physical injury is defined as "substantial physical pain or any impairment of physical condition." Ky. Rev. Stat. § 500.080(17). The defense conceded this finding was supported by the evidence.[3]

### IV. Sentencing Framework

Under 18 U.S.C. § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant's conviction pursuant to 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Crime of Violence) is a Class A felony. *See* 18 U.S.C. § 924(c)(1)(A); 18 U.S.C. § 3559(a)(1). For a Class A felony, the maximum revocation sentence provided under 18 U.S.C. § 3583 is five years of imprisonment.

---

[3] Without citing authority, the defense argued Defendant could not be found guilty of both assault in the second degree and in the fourth degree as to Swain because the latter is a lesser-included offense. In the Court's view, because the most serious violation grade determines the range, the Grade C violations found herein are really only probative as additional circumstances to be considered when evaluating the § 3553(a) factors that apply at revocation.

*See* 18 U.S.C. § 3583(e)(3).  He can be put back on supervised release following revocation for five years, less any term of imprisonment imposed pursuant to 18 U.S.C. § 3583(b)(1).

The Policy Statements in Chapter 7 of the Guidelines provide advisory imprisonment ranges for revocation premised on Defendant's criminal history (at the time of original sentencing) and the "grade" of the particular violation proven.  *See United States v. Perez-Arellano*, 212 F. App'x 436, 438 (6th Cir. 2007) ("Although the policy statements found in Chapter Seven of the United States Sentencing Guidelines recommend ranges of imprisonment, such statements 'are merely advisory' and need only be considered by the district court before sentence is imposed.") (internal citation omitted).  The Guidelines also instruct that, "[w]here there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade."  U.S.S.G. § 7B1.1(b).

The Court finds strangulation in the first degree is a Grade A violation.  This was not contested by the defense, and the Sixth Circuit recently held that a very similar Tennessee statute "clearly qualifies as a violent felony" under a use-of-force analysis.[4]  *United States v. Batey*, No. 22-5339, 2023 WL 2401193, at *4 (6th Cir. Mar. 8, 2023).  Indeed, the Sixth Circuit made very quick work of this otherwise complicated analysis.

Because finding strangulation to be a Grade A violation dramatically affects the Guidelines range, the Court will detail its analysis of the issue.  Strangulation in the first degree qualifies as a "state…offense punishable by a term of imprisonment exceeding one year that … is a crime of violence."  U.S.S.G. § 7B1.1(a)(1).  The term "crime of violence" as used in U.S.S.G.

---

[4] The Court is under a duty to accurately calculate the Guidelines range, notwithstanding the failure of a party to contest what the proper Guidelines range is.  *E.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (most Guidelines calculation errors will meet the requirements to obtain relief under the plain error standard of review).

7

§ 7B1.1 is defined in U.S.S.G. § 4B1.2. U.S.S.G. § 7B1.1 n.2. Under U.S.S.G. § 4B1.2, a crime of violence includes certain enumerated offenses, as well as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a). The elements clause inquiry is governed by the categorical approach. *United States v. Camp*, 903 F.3d 594, 599-600 (6th Cir. 2018) ("Under our caselaw and the guidance provided by the Guidelines Manual itself, we are to apply the categorical approach as set out and repeatedly reaffirmed by the Supreme Court. We … hold that the categorical approach applies to both prior and instant offenses") (internal citation omitted). When applying the categorical approach, courts ask "only whether an individual's crime of conviction necessarily … triggers a particular consequence under federal law." *Pereida v. Wilkinson*, 592 U.S. 224, 233 (2021). "[A] court does not consider the facts of an individual's crime as he actually committed it." *Id*.

When determining whether a state law meets the categorical approach's stringent demands, state court interpretations of that law are binding on federal courts. *Johnson v. United States*, 559 U.S. 133, 138 (2010). When a "single statute … list[s] elements in the alternative, and thereby define[s] multiple crimes," courts may employ the modified categorical approach. *Mathis v. United States*, 579 U.S. 500, 505 (2016). When that is the case, courts may engage in fact-finding (consulting the relevant permissible sources) to determine which "offense" the defendant has committed. *Id*. at 505-06.

Here, the relevant Kentucky statute provides that:

(1) A person is guilty of strangulation in the first degree when the person, without consent, intentionally impedes the normal breathing or circulation of the blood of another person by:
   (a) Applying pressure on the throat or neck of the other person; or
   (b) Blocking the nose or mouth of the other person.

8

Ky. Rev. Stat. § 508.170. Thus, under the elements clause, the relevant statute defines multiple crimes by listing elements in the alternative. A defendant can violate the statute (assuming all other elements are met) either by (1) "by [a]pplying pressure on the throat or neck of the other person" or (2) by "[b]locking the nose or mouth of the other person." Ky. Rev. Stat. § 508.170. As detailed below, Defendant violated Ky. Rev. Stat. § 508.170 "by [a]pplying pressure on the throat or neck of the other person" and not by "[b]locking the nose or mouth of the other person." Thus, the former category, not the latter one, determines whether Defendant committed a crime of violence.

For an offense to meet the requirements of the elements clause, it must have a least culpable *mens rea* of either knowledge or purpose. *Borden v. United States*, 593 U.S. 420, 429 (2021) (*mens rea* of recklessness is insufficient under the elements clause). Because the statute is limited to intentional conduct (specifically, "intentionally impedes the normal breathing or circulation of the blood of another person"), the *mens rea* requirement for the elements clause is met. *Id*.

Further, the word "force" in the elements clause, as a general matter, denotes "violent force – that is, force capable of causing physical pain or injury to another person." *Stokeling v. United States*, 586 U.S. 73, 82 (2019). So, when an offense criminalizes "mere touching," it does not trigger the elements clause. *Johnson*, 559 U.S. at 141. But "physical force is … capable of causing physical injury … when it is sufficient to overcome a victim's resistance." *Stokeling*, 586 U.S. at 85.

Kentucky courts have interpreted the word "impede" in Kentucky's strangulation statute as extending the statute to cover those situations where a defendant "interfere[s] with the progress of … hinder[s] or … obstruct[s]" an individual's normal breathing. *Saxton v. Commonwealth*, 671 S.W.3d 1, 10-11 (Ky. 2022). Kentucky's Supreme Court has explained that "when a person

testifies that they were choked and there is redness on the neck" the Commonwealth can survive a directed verdict on a strangulation charge. *Upton v. Commonwealth*, No. 2022-SC-0465-MR, 2024 WL 647597, at *7 (Ky. Feb. 15, 2024). Thus, a rational jury could infer, given that testimony, "that there was enough pressure to impede normal breathing." *Id*. Still, the Supreme Court of Kentucky has clarified that the Commonwealth must meet a "fairly strict burden of proof" before it can convict a defendant of strangulation. *Id*. at *6. An individual does not commit the offense in question merely by grabbing another individual's neck without consent. *Upton*, WL 647597 at *8.

Ky. Rev. Stat. § 508.170(1)(a) can only be committed by "intentionally imped[ing] the normal breathing or circulation of the blood of another person" without that other person's consent. Thus, a defendant can commit that offense only by using physical force (as that term is used in the elements clause) since a defendant can only commit that offense if the defendant uses force "sufficient to overcome a victim's resistance." *Stokeling*, 586 U.S. at 85.[5] Under U.S.S.G. § 7B1.1(a), Defendant's conduct qualifies as a Grade A violation.[6]

---

[5] The categorical approach often reveals unanticipated rabbit holes that could lead to seemingly endless and abstract analyses. The undersigned has considered whether Ky. Rev. Stat. § 508.170 is divisible or indivisible, and cannot find any guiding Kentucky law on whether subsections (1)(a) and (b) are distinguished by different elements or means. But it really does not matter whether the statute is divisible or indivisible. The Court has already explained why subsection (a) satisfies the use-of-force test. Subsection (1)(b) does as well. In *Stokeling*, the Supreme Court explained that "the force necessary to overcome a victim's physical resistance is inherently violent in the sense contemplated by [*Johnson v. United States*, 559 U.S. 133 (2010)], and suggests a degree of power that would not be satisfied by mere touching." *Stokeling*, 586 U.S. at 83. "Physical force or force capable of causing physical pain or injury includes the amount of pain necessary to overcome a victim's resistance." *Stokeling*, 586 U.S. at 86. The "without consent" element necessarily means that a victim's resistance to having their nose/mouth blocked under subsection (1)(b) must also be overcome. Thus, every possible violation of the statute is a crime of violence.

[6] The other state charges within Violation #1 are Grade B & C violations. The Sixth Circuit has recently indicated (without formally deciding) that Ky. Rev. Stat. § 508.020 is both indivisible and not a crime of violence. *United States v. Wright*, No. 22-5452, 2023 WL 4995748, at *3-5 (6th Cir. Aug. 4, 2023). For the reasons given by the *Wright* court, the Court concludes that Ky. Rev. Stat. § 508.020 is not a crime of violence under the elements clause. No party has asserted that this type of assault is a crime of violence

Given Defendant's criminal history category of VI (the category at the time of his conviction in the Eastern District of Tennessee) and a Grade A violation, Defendant's range, under the Revocation Table of Chapter 7, is fifty-one to sixty-three months. *See* U.S.S.G. § 7B1.4(a). Consistent with the guidance of appellate courts, this Court takes the Guidelines-recommended sentence as its starting point and has remained cognizant of it in forming its recommended revocation sentence. *E.g.*, *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016).

The presence of a Grade A violation means that revocation is recommended under the Guidelines. U.S.S.G. § 7B1.3(a)(1) ("Upon a finding of a Grade A or B violation, the court shall revoke probation or supervised release."). Even if revocation were not mandatory, revocation would be appropriate in this case due to the nature of the violation. Neither side argued for a non-revocation penalty.

Defendant's mother gave a victim's statement. She asked that Defendant "be put in a place where [Defendant] won't hurt himself or [anybody] else." She conveyed that she had taken Defendant home to live with her, and that when she did so, he did not recognize her initially. She also explained that he had previously been shot in the head, and that she thought that the shooting had affected his cognitive abilities.

---

under the enumerated offense clause. Thus, a violation of Ky. Rev. Stat. § 508.020, a Class C felony punishable by imprisonment of five to ten years, would establish a Grade B violation.

Finally, establishing that a defendant committed assault in the fourth degree under Ky. Rev. Stat. § 508.030 would establish only that the defendant committed a Grade C violation of the terms of his supervised release. Under U.S.S.G. § 7B1.2(a)(3), Grade C violations include any "conduct constituting [] a … state … offense punishable by a term of imprisonment of one year or less." U.S.S.G. § 7B1.2(a)(3). Under Kentucky law, "[a]ssault in the fourth degree is a Class A misdemeanor." Ky. Rev. Stat. § 508.030(2). And Kentucky law specifies that "[f]or a Class A misdemeanor, the term [of imprisonment] shall not exceed twelve (12) months." Ky. Rev. Stat. § 532.090(1). Thus, assault in the fourth degree constitutes a state offense punishable by a term of imprisonment of one year. Thus, it constitutes a Grade C violation of Mandatory Condition #1.

The United States recommended fifty-four months of incarceration followed by six months on supervised release to be served at a halfway house. In making that recommendation, the United States relied on the fact that Defendant's conduct caused two people to suffer serious harm. Concerning supervised release, the United States noted that Defendant's mother wants Defendant to get mental health treatment, and supervised release is the only way for the United States to facilitate Defendant obtaining that treatment. The United States also explained that six months of supervised release (instead of a sixty-month term of imprisonment) would allow him to re-enter society in a stabilized fashion. The United States also acknowledged that Defendant's mental health was a mitigating factor in this case, and that, despite his inability to stipulate, he should nonetheless be viewed as having accepted responsibility because he initially intended to stipulate, but, although competent, his mental health challenges prevented an effective stipulation and necessitated a final evidentiary hearing.

Defense counsel recommended a term of imprisonment of fifty-one months followed by nine months of supervised release to be served in a halfway house. In defense counsel's view, "there has to be some step down." Defense counsel pointed out all the ways that Defendant's transition back into society could fail if he was not placed on supervised release after incarceration and explained how those risks would be mitigated if he was placed in a halfway house. Defense counsel also thought that a term of imprisonment of fifty-one months was sufficient, but no greater than necessary, to take account of the relevant sentencing factors, given Defendant's mental health status.

Defendant allocuted. Although he exhibited pressured and disorganized speech consistent with his mental health history, he sincerely stated that he loved his mother.

## V. Sentencing Recommendation

The Court has reviewed the entire record, including the Report and its accompanying documents, and Defendant's underlying judgment and sentencing materials. The Court has also considered all of the 18 U.S.C. § 3553(a) factors imported into the § 3583(e) analysis. Through that consideration, the Court recommends that Defendant's supervision be revoked and that he be sentenced to a fifty-four month term of imprisonment followed by six months of supervised release, to be served in a halfway house in Manchester, Kentucky.

First, the Court addresses the nature and circumstances of Defendant's underlying offense. Defendant's underlying crimes of bank robbery and possession of a firearm in furtherance of a crime of violence are serious offenses. Defendant chose to use firearms to further his criminal aims, threatening to "come back [to the bank he robbed] shooting if anyone pulled any alarms or if he received a dye pack." Defendant repeatedly threatened to start shooting while he was in the process of robbing the bank, causing the bank teller to fear for her life. And after fleeing from the bank, Defendant decided to open fire upon officers attempting to stop him. In short, Defendant's underlying offenses demonstrate serious disregard for the value of human life and propensity for dangerous violence. This factor supports a lengthy term of imprisonment.

The Court next considers Defendant's history and characteristics. Defendant clearly needs continuing mental health treatment. Defendant's mental health condition is both a mitigating and aggravating factor. The Court is sympathetic to the significant mental health problems and challenging treatment scenario revealed during the lengthy competency proceedings, but it must also account for the impact of those problems. Defendant's past history of violence, which certainly is connected to his mental health problems, enhances the need to protect the public from him. This factor marginally supports a significant term of imprisonment.

13

The need to deter criminal conduct, both for Defendant and society, and the need to protect the public from further crimes heavily influence the Court's recommended sentence. The defense recognizes that the violations are far too serious to support a sentence below the Guidelines range minimum of fifty-one months. Defendant poses a serious danger to the public, and this dangerousness could easily justify requiring Defendant to serve a maximum revocation term of sixty months. Nevertheless, Defendant will likely be unable to successfully reintegrate into society without some period where he obtains assistance functioning in society. And should Defendant fail to reintegrate into society, the Court thinks it is highly likely that Defendant will continue to act as he has in the past. That prediction strongly influences the Court's conclusion that six months of supervised release, to be served in a halfway house, is needed to protect the public from Defendant.

The Court must also consider whether a defendant needs any education, training, or treatment. Defendant clearly needs mental health treatment, and per Officer Armstrong, the halfway house in Manchester has reliable mental health services which, in the Court's view, are the best available tool at this point to addresses this sentencing consideration.

The Court must seek to avoid unwarranted sentencing disparities among defendants with similar records who are found guilty of similar conduct. Here, that sentencing factor is accounted for by sentencing Defendant to a within-Guidelines term of imprisonment.

In fashioning its recommended sentence, the Court must take into account whether an additional term of supervised release is warranted. An additional term of supervised release is warranted in this case. Defendant's history of violence, lengthy prior term of imprisonment, and mental health status require that further supervised release be imposed to ensure, insofar as it can

14

be, that Defendant be successfully integrated into society upon the conclusion of his term of imprisonment.

Finally, the Guidelines suggest that the ***primary*** wrong in the supervised release context is violation of the Court's trust by an offender; the particular conduct is an important but secondary issue. *See* U.S.S.G. Chp. 7 Pt. A(3)(b) ("[A]t revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator."). Defendant's decision to attack his mother and Etta Sergent was a serious breach of the Court's trust, as it demonstrated his failure to obey a fundamental rule of society: violence is not permitted. This factor strongly supports a lengthy period of incarceration.

In short, fifty-four months of imprisonment followed by six additional months on supervised release is sufficient, but no greater than necessary, to address the 18 U.S.C. § 3553(a) factors that are imported into the § 3583(e) analysis.

Prior to the final hearing, Officer Armstrong informally notified the undersigned that, according to the BOP, Defendant will receive federal time credit back to the date of his state arrest on November 10, 2020. This calculation is noteworthy given the lengthy competency proceedings in this case, but does not, in the undersigned's view, alter the sentencing recommendation made herein.

### VI. Conclusion

Based on Defendant's conduct, and in consideration of the factors discussed above, the Court **RECOMMENDS**:

(1) That Defendant be found guilty of Violation #1;

(2) Revocation and imprisonment for a term of fifty-four months;

(3) Six months of supervised release under the conditions contained in Defendant's prior judgment; and

(4) Requiring that Defendant serve the term of supervised release at a halfway house in Manchester, Kentucky and receive mental health treatment pursuant to the existing Special Condition #2 of his Judgment, or language for the same treatment utilized in this District.

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. D.E. 74. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on District Judge Wier's docket upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 31st day of July, 2024.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge